Michigan Mutual Liability Company, a Corporation, Plaintiff-Appellant, v. Type and Press Company of Illinois, Inc., a Corporation, and Arthur Holmes, Defendants-Appellees.

Gen. No. 50,039.

First District, First Division.

September 13, 1965.

Rehearing denied October 1, 1965.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (Oswell G. Treadway, of counsel), for appellant.

West and Egan, of Chicago (Lawrence J. West and Stuart West, of counsel), for Type and Press Company of Illinois, Inc., appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

The Michigan Mutual Liability Company brought this action against its insured, Type and Press Company of Illinois, Inc., for reformation of the insurance policy and against Arthur Holmes for a declaration that the insured is not entitled to coverage under the policy with respect to a claim filed by Holmes arising out of injuries which he sustained on August 6, 1962, while operating a guillotine press sold by the insured. The insurance company sought reformation of the policy on the grounds that the endorsements to the policy adding products liability coverage were issued through inadvertence and mistake and were contrary to the agreement of the parties inasmuch as they des-

ignated as the effective date August 1, 1962, (prior to Holmes injury) instead of August 7, 1962.

A Master in Chancery, to whom the case was referred and who heard all of the evidence, found that "the proof does not clearly and convincingly show that a mistake was made which was mutual and common to both parties in issuing the endorsement in question to be effective August 1, 1962, instead of August 7, 1962. There is no charge of fraud and both parties were fully informed of the problem presented at the time the endorsement was issued." The insurance company appeals from an order of the Chancellor overruling exceptions to the Master's reports, approving and confirming those reports and dismissing the case for want of equity.

The record discloses that the insured sells rebuilt and used printing machinery and equipment for use in the graphic arts. The insurance company originally issued a comprehensive general liability policy to the insured on May 9, 1962, covering the period from June 1, 1962, to June 1, 1963. The policy was countersigned on behalf of the insurance company by A. J. Shorey of the insurance brokerage firm of Price, Buesch and Shorey, the authorized representative of the insurance company. By the terms of this policy, products hazards were specifically excluded from coverage.

On August 6, 1962, Arthur Holmes sustained personal injuries while using a product distributed by the insured for which he subsequently filed suit against the insured. The insured's office manager, Howard Mikkelsen, testified that on the day following Holmes' injuries he telephoned Price, Buesch and Shorey, which had written insurance for his company for about fifteen years, and that he spoke to John Buesch. He recounted the conversation as follows:

I told Mr. Buesch, I believe, there was an accident with one of our machines that we had sold to a

366

customer in which we might become involved and were we covered under our liability policy. . . . He looked up the policy and said no, we weren't, but he would have Mr. Shorey contact me.

The following day Mikkelsen spoke to Mr. Shorey on the telephone. Mikkelsen indicated the possibility that a machine which was sold by his company was involved in the accident and he asked whether the company was covered. Shorey indicated that the company was not covered. Mikkelsen recounted the remainder of the conversation as follows:

> I asked him why we weren't and he said well, there was something he overlooked but he would come out and talk to me about it. I said I believe we should be covered so he said he would get the rates together and the other information and come out and see me, which he did.

Mikkelsen testified that when Shorey did visit him a few days later, they had the following conversation:

> I asked Mr. Shorey if there was [some possibility that the insured might become involved in the accident], why we were never offered this type of insurance before and he said well, it was an oversight on his part but, however, he was going to bind me on this and in issuing it, as long as there is no suits pending, he would try and make it retroactive before the 6th of August. . . . I said that was fine.

Mikkelsen further testified that he received three endorsements during October, 1962, one of which added products liability coverage and the other two of which increased the limits of liability. All three endorsements had an effective date of August 1, 1962. Mikkelsen noted the effective date at the time the endorsements were received.

On November 21, 1962, the insured received summons in the suit commenced by Holmes. Mikkelsen testified that he telephoned Shorey at that time; that he told Shorey of the suit and that he was going to send the summons to the insured's attorney. Mikkelsen testified further that Shorey told him that he would take care of it and asked that the summons be mailed to him.

Mikkelsen further stated that sometime in December 1962, he received from the broker a letter dated October 3, 1962, addressed to the broker and signed by L. B. Segur, an underwriter for the insurance company, advising the broker that the company was issuing an endorsement adding products liability coverage effective August 7, 1962. He also received a letter dated November 26, 1962, also addressed to the broker and signed by Segur advising the broker that he was enclosing two endorsements correcting the effective dates of the addition of products liability endorsement and the increased limits of liability endorsement and further advising that "the issuance of these endorsements showing the incorrect effective date of August 1, 1962, was a clerical error on my part."

Arba Shorey, of the insurance brokerage firm, testified that in the telephone conversation of August 8, 1962, Mikkelsen asked whether the insurance which his company had would cover a claim arising out of the injury which occurred two days before. Shorey testified:

> . . . I said, ". . . certainly I do not have authority to write insurance for you that would provide coverage." . . . I think during this conversation that Mr. Mikkelsen said to me, "Well, Shorey, is it possible that insurance might be written in such a manner that it would cover this accident," and I think that I had—I did not answer him directly in

terms of yes or no. I think I said, "Well, Mick, you can pretty well evaluate this yourself. I don't have the authority to do it. We have to submit all of the information to the insurance company and it's a certainty that some underwriter isn't going to write insurance in a situation where he would have a potential liability."

On the same day of this conversation Shorey requested the insurance company to issue products liability coverage for the insured. He denied, on cross-examination, that he attempted to obtain retroactive coverage for the defendant. When he originally received the endorsements from the insurance company he admitted that he probably saw them with the effective date of August 1, 1962, because in the normal course of office procedure the endorsements would ultimately come to his desk. He said that he did nothing at that time to correct the effective date on the endorsements. He testified that after that the first time he actually became aware that the effective date was August 1, 1962, was when he talked to Mikkelsen some time around Thanksgiving. In that conversation, Shorey testified that Mikkelsen informed him about the summons and asked whether the policy would provide coverage. Because he was in doubt about the answer, Shorey got out his file and when Mikkelsen pointed out the effective date of August 1, 1962, Shorey said:

"Well, by golly, you stopped me cold now." I said, "I don't know now the answer to your question but if you will send your papers in, your summons in and so on, I will submit it to the insurance company and we will get an answer for you right away."

Although Shorey stated that he did not have authority to write policies on behalf of the insurance company

369

for his customers, it appears that as general agent for the insurance company his firm had authority to countersign the involved endorsements and that the signatures of members of the firm do appear on the endorsements in that capacity.

John Buesch, an associate of Shorey's in the insurance brokerage firm, testified that when Mikkelsen called on August 7, 1962, he informed Mikkelsen that he did not have products liability insurance for the accident of August 6, 1962; that when Mikkelsen said that they ought to have this type of coverage, he said he would bind coverage as of August 7, 1962; and that he told Mikkelsen that the premiums would be based on the insured's gross annual sales.

Louis B. Segur, an underwriter for the insurance company, testified that after he received the order from the broker, he computed the additional premiums for the two endorsements and in a letter to Shorey dated October 3, 1962, advised the broker of the amounts. On a carbon copy of that same letter he wrote in longhand the following instruction to a rate clerk of the insurance company: "John Endorse for Products cover eff 8–1–62." Segur testified that he intended to write "8-7-62," but by mistake wrote the earlier date. He stated that he had no authority to date the endorsement prior to the date of application for the insurance and he said that after it was received by the insurance company's claim department, the summons was forwarded to the broker along with the change of the effective date on the endorsements from August 1, 1962, to August 7, 1962.

It is well settled that our courts have the power and the duty to reform written instruments on the ground of mistake of fact where it is shown that the mistake was mutual and common to both parties; that it was in existence at the time of execution of

the instrument and that at that time the parties intended to say one thing, but by mistake, expressed another. Schmitt v. Heinz, 5 Ill2d 372, 125 NE2d 457; Pulley v. Luttrell, 13 Ill2d 355, 148 NE2d 731. Where the contracting parties have reduced their agreement to writing it is presumed to express their mutual intention and the presumption can only be overcome by evidence which is strong or clear and convincing. Biskupski v. Jaroszewski, 398 Ill 287, 76 NE2d 55; Hyman-Michaels Co. v. Massachusetts Bonding & Ins. Co., 9 Ill App2d 13, 132 NE2d 347; New York Life Ins. Co. v. Rak, 30 Ill App2d 86, 173 NE2d 603.

 In the instant case the Master, who heard all the evidence and saw the witnesses, concluded that the proof did not clearly and convincingly show that a mistake of fact was made which was common and mutual to both parties and that no charge of fraud was raised. The Master's findings were reviewed and confirmed by the Chancellor. In this situation, we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. Pasedach v. Auw, 364 Ill 491, 4 NE2d 841; Schmitt v. Heinz, 5 Ill2d 372, 125 NE2d 457. The insurance company does not argue that this is not the rule, but it contends that the Master's findings were against the manifest weight of the evidence because there was no conflicting evidence to be considered by the trial court. We believe that it is clear that Mikkelsen's testimony conflicts with that of other witnesses and that it could properly be inferred from his testimony that there was no mistake which was mutual to both parties. The insurance company contends, however, that even if it could be inferred from Mikkelsen's testimony that the agreement provided coverage prior to August 7, 1962, that testimony was not binding on it and could not properly have been con-

sidered by the Master because Mikkelsen was only called by the insurance company pursuant to Section 60 of the Civil Practice Act (Ill Rev Stats 1963, c 110, § 60). The argument is not well taken. Although the language of Section 60 makes it clear that a party calling a witness thereunder is not bound by what he says, the section specifies that the calling party may impeach a witness or rebut his testimony. However, nothing in the section or in the cases decided under it entitles the calling party to ask that the court disregard the witness' adverse testimony altogether.

We have reviewed the record and conclude that the Master's findings are within the range of the testimony and are not against the manifest weight of the evidence. We have considered the cases cited by the insurance company and find that they do not require a different result. Therefore, the findings and the order of the Chancellor confirming the Master's reports and dismissing the insurance company's complaint for want of equity should be affirmed.

Order affirmed.

MURPHY and KLUCZYNSKI, JJ., concur.