State Farm Mutual Automobile Insurance Company, Plaintiff, Counterdefendant-Appellant, and Cross-Appellee—(Marvin D. Blanton, Counterdefendant-Appellant and Cross-Appellee,) *v.* Connie Sue Hanson *et al.*, Defendants, Counterplaintiffs-Appellees, and Cross-Appellants.

(No. 11616;

Fourth District—October 17, 1972.

Philips, Phebus, Tummelson & Bryan, of Urbana, (Hurshal C. Tummelson and George G. Bryan, of counsel,) for appellants.

Richard K. Bates, Austin W. Buchanan, and Edward Litak, all of Danville, for appellees.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

On the 4th day of September, 1967, Cheryl Christine Hanson was operating her automobile in Warren County Kentucky with her sister, Connie Sue Hanson, as a passenger when she was involved in a collision with an automobile driven by Jerry Wayne Sloan. Connie Hanson subsequently filed suit against Sloan in Kentucky for her personal injuries and he in turn filed a third party complaint against Cheryl Hanson for her alleged negligence. A second lawsuit was instituted in Vermilion County by Connie Hanson for her personal injuries and was directed against her sister Cheryl.

At the time of the collision Cheryl was insured under a policy of automobile liability insurance issued by State Farm Mutual Automobile Insurance Company. Under Coverage A of its policy, State Farm agreed to pay, on behalf of Cheryl, all sums she became legally obligated to pay as damages for bodily injuries sustained by other persons. However, the policy contained the following exclusion, commonly referred to as a "household exclusion":

"This insurance does not apply under:

\* \* \*

(i) coverage A, to bodily injury to the insured or any member of the family of the insured residing in the same household as the insured; \* \* \*."

State Farm filed the present lawsuit in the Circuit Court of Vermilion County for a declaration that it was not obligated to defend Cheryl Hanson under the terms of its policy or pay any judgments rendered against her in the pending litigation because of the household exclusion. By virtue of the provisions of the Declaratory Judgment Act this suit was directed against Cheryl Hanson, Connie Hanson, and Jerry Wayne Sloan. All three defendants responded to the complaint and filed identical counterclaims. These counterclaims sought to reform the policy of insurance issued by State Farm by striking the household exclusion, and also sought recovery against State Farm and its agent, Marvin D. Blanton, for their alleged negligence in issuing the policy.

The case was tried without a jury, and at the end of all the evidence the trial court entered an order denying the relief sought by State Farm on its complaint. The lower court also held that there was no negligence on the part of State Farm or its agent, Blanton. However, the court did grant the reformation requested by the counterclaims and reformed the policy by deleting the household exclusion, and providing that State Farm was obligated to provide coverage under the policy to Cheryl Hanson for the claim brought against her by Jerry Wayne Sloan and Connie Sue Hanson as a result of the September 4, 1967, collision. State Farm has appealed from that portion of the order granting reformation and the defendants have appealed from that portion of the order declaring that there was no negligence on the part of State Farm in the initial issuance of the policy. We shall first consider the action of the trial court in granting the reformation sought by the defendants.

■■ "The law is well settled that a court * * * may reform an insurance policy where the contracting parties make a mistake and the policy fails to express the real contract between them." (*New York Life Insurance Co. v. Rak* (1961), 30 Ill.App.2d 86, 93, 173 N.E.2d 603, aff'd (1962), 24 Ill.2d 128, 180 N.E.2d 470.) Furthermore, to reform an insurance contract on the ground of mutual mistake the party seeking the reformation must establish a mutual mistake of fact, not of law, which was common to both parties to the contract and was in existence at the time the contract was executed. The party attempting reformation must prove, in essence, that both parties to the instrument intended to say a certain thing but because of mutual factual mistake said something different. (*Wilcox v. Natural Gas Storage Co.* (1962), 24 Ill.2d 509, 512, 182, N.E.2d 158; *Ambarann Corp. v. Old Ben Coal Corp.* (1946), 395 Ill. 154, 166, 69 N.E.2d 835; *Sedlacek v. Sedlacek* (1969), 107 Ill.App.2d 334, 337, 246 N.E.2d 6; *Michigan Mutual Liability Co. v. Type & Press Co.* (1965), 62 Ill.App.2d 364, 370-71, 210 N.E.2d 787.) Thus, in *Hyman-Michaels Co. v. Massachusetts Bonding and Insurance Co.* (1956), 9

Ill.App.2d 13, 20, 132 N.E.2d 347, a suit to reform a contract of insurance, the court wrote:

> "In analyzing the evidence we have in mind that in a suit to reform a written contract, a plaintiff is not merely seeking to rescind or avoid the contract but is seeking to enforce a contract different from that which he has signed. He must therefore be able to point to the contract he intended to make. Moreover, he must prove a like intention on the part of the defendant. In other words, both defendant and plaintiff must have had the intention to make the same contract, but failed to do so by each making the same mistake."

■■ In an action to reform a written contract the plaintiff has a higher burden of proof than in an ordinary civil lawsuit. Although an older Supreme Court decision often cited in reformation cases suggested that "the evidence must leave no reasonable doubt as to the mutual intention of the parties" (*Ambarann Corp. v. Old Ben Coal Corp.* (1946), 395 Ill. 154, 166, 69 N.E.2d 835), a review of the decisions discloses that the burden a plaintiff must sustain is to prove his case by very strong, clear and convincing evidence. (*Sedlacek v. Sedlacek, supra; Michigan Mutual Liability Co. v. Type & Press Co.,* (1965), 62 Ill.App.2d 364, 371, 210 N.E.2d 787; *New York Life Insurance Co. v. Rak* (1961), 30 Ill.App.2d 86, 92, 173 N.E.2d 603, aff'd, 24 Ill.2d 128, 180 N.E.2d 470 (1962); *Hyman-Michaels Co. v. Massachusetts Bonding and Insurance Co.* (1956), 9 Ill.App.2d 13, 20-21, 132 N.E.2d 347.) It is clear that we are not warranted in reversing the holding of the trial court where the decision rests upon a disputed question of fact unless that decision is contrary to the manifest weight of the evidence. *Michigan Mutual Liability Co., supra; Hyman-Michaels Co., supra* at 21; *Stoltz v. National Indemn. Co.* (1952), 345 Ill.App. 495, 502, 104 N.E.2d 320.

■■ The various defendants have suggested that the household exclusion set forth above was ambiguous and, therefore, should be construed in favor of the insured, Cheryl Hanson. In conjunction with this argument the defendants also argue that Connie Hanson was not a "member of the family of the insured", Cheryl Hanson, at the time of the collision. Neither of these contentions is well founded. First, a reading of the exclusion discloses that it is written in clear and concise language. Second, the evidence establishes that Connie and Cheryl Hanson were sisters who were living with each other in a household presided over by their mother at the time of the accident in question. Surely this constitutes a "family" in the commonly accepted meaning of that word. Accordingly, under the household exclusion of its policy State Farm would be under no obligation to defend Cheryl Hanson for any lawsuits

arising out of the September 7, 1967, accident insofar as they relate to injuries sustained by her sister unless the trial court was correct in its determination that the policy must be reformed to omit the household exclusion.

The crucial testimony on the question of reformation was elicited from the insured, Cheryl Hanson, and the agent who took her application for the policy, Marvin D. Blanton. Miss Hanson testified that the first time she contacted Mr. Blanton for insurance was in the summer of 1966 when she went to his office and applied for a policy of insurance to cover a 1960 Buick automobile she had recently purchased. On that occasion Miss Hanson testified that she told Mr. Blanton that she wanted "full coverage". If reformation were premised on this basis alone it would have to be denied since the term "full coverage" is so nebulous and subjective as to be meaningless. For example, if the term "full coverage" was carried to its logical extreme then the policy issued by State Farm would have to be reformed to omit all exclusions not just the household exclusion. Clearly, this was not contemplated by the parties.

However, Miss Hanson went on to testify that in the course of her conversation with Mr. Blanton she asked him if she would be protected from lawsuits by injured passengers and he replied that she would indeed have such protection. She stated that Mr. Blanton also asked her who were her most frequent passengers and she replied that her brothers and sisters often rode with her. On direct examination, Miss Hanson testified that she went to Blanton's office and had the following conversation with him:

"Q. What did you tell him?

A. I told him that I'd just gotten a car and would like to have insurance on it.

Q. Did you tell him what you wanted from him?

A. Well, I told him I needed some kind of insurance.

Q. Did you tell him what kind of insurance you wanted? * * *

A. Well, I told him that I would like to have full coverage insurance.

Q. And did you discuss the term "full coverage"?

A. Yes, we did.

Q. What was said with regard to that?

A. He explained to me what full coverage insurance was.

Q. Now you say full coverage—now what was actually said?

A. Well, he told me that when somebody comes in for insurance the first time, they usually get full coverage.

Q. Now, did he say what full coverage means? What it would do for you if somebody sues you? Did he tell you things like that?

A. Well, he said it would cover me on road service, and collision, and liability, and medical, and—

Q. Did he explain what liability was?

A. Yes, he did.

Q. What did he say?

A. *He said that if somebody were injured, that my insurance would cover it.*

Q. Now did you ask him what would happen if a passenger were injured?

A. *Yes, I asked him if I would be in a wreck and any of my passengers were injured or somebody in the other car was injured, if I was sued, would I be covered, and he said 'yes'.*

 \*  \*  \*. (Emphasis supplied.)

Q. Tell us your discussion with regard to passengers.

A. Well, he wanted to know who my most frequent passengers were.

Q. What did you tell him?

A. Well, usually my sisters and brother.

Q. Did you mention your sisters by name?

A. I don't believe so.

Q. Did you tell him what use you were making of the automobile?

A. Yes, I did.

Q. What did you tell him?

A. I told him back and forth to work and to the store and home again.

Q. Did you mention anything about taking anybody to school or out socially?

A. I told him we usually made trips—you know, long distance trips.

Q. Did you tell him who you would travel with on those occasions?

A. No, I didn't.

Q. Did he ask anything further about your trips or travel or use of the automobile?

A. No, he didn't.

Q. Now, Cheryl, I show you what is marked Joint Exhibit Number One. This is an insurance policy that was issued in 1967.

A. Yes.

Q. Did you ever read this policy?

A. I've glanced through it.

Q. Did you read the various paragraphs at length?

A. Not word for word, no.

Q. Have you had any training or experience in the interpretation of insurance policies?

A. No."

On cross-examination by counsel for State Farm, Miss Hanson acknowledged that when she received the policy in the mail she "glanced through it" and saw the household exclusion. However, it is unclear whether or not she specifically read the actual exclusion word-for-word:

"Q. Now you received a policy of insurance, didn't you?

A. Yes, I did.

Q. Did you look at the policy?

A. I glanced through it.

Q. You understood that when you got that policy of insurance, that this was your insurance, didn't you?

A. Yes, I did.

Q. Did you look at the policy and read it to find out the answers to some of the things you say you asked Mr. Blanton?

A. I didn't read it word for word, no.

Q. Did you read it with that idea in mind when you talked to Mr. Blanton in 1966?

A. Yes.

Q. Did you see the household exclusion in the policy which is the subject of this lawsuit?

A. Yes.

Q. This policy does not apply to bodily injury to any person residing in the same household as the insured. Did you read that?

A. I glanced at it.

Q. You glanced at it for the purpose of understanding it and reading it, didn't you, Cheryl?

A. I read the heavy type that was on the policy.

Q. When did you read that?

A. The day after I received it in the mail.

Q. The policy, that is?

A. Yes."

Mr. Blanton stated that he "vaguely" remembered the conversation he had with Miss Hanson in the summer of 1966. With respect to this conversation, Mr. Blanton testified as follows:

"Q. What did you say and what did she say, as near as you can remember?

A. As near as I can remember, I first explained that she had liability coverage, property damage, medical pay, comprehen-

sive, collision deductible, road service. I am not sure at that time, maybe uninsured motorist.

Q. Did Cheryl Hanson at any time say to you, in substance, anything about her brothers and sisters being in the car and being injured and making claim against her?

A. No, she did not.

Q. Did you, at any time, say anything to her about claims which might be made by her brothers and sisters against her and whether or not such claims would or would not be covered?

A. No, I did not.

Q. Now at that time, the policy which State Farm issued and which you had issued all along contained the family household exclusion, did it not?

A. That's correct.

Q. Is there any occasion that you discussed that specifically with Cheryl Hanson?

A. No, I did not.

Q. When you say you discussed the policy with Miss Hanson, at that time did you discuss every provision in the policy in detail?

A. No, I did not.

Q. Did you discuss these coverages in general, Mr. Blanton?

A. Just a general statement, yes.

Q. Did she ask you any questions that you are able to remember concerning anything that you said to her?

A. None that I can remember."

In June of 1967, Miss Hanson changed automobiles and purchased a 1963 Chevrolet. At that time she visited Mr. Blanton and obtained the policy of insurance in question. This policy is identical with the policy issued by State Farm to Miss Hanson in 1966. When she obtained the 1967 policy, Miss Hanson stated that she inquired as to whether or not her coverage would remain the same and she was informed that it would.

■■ We are mindful of the fact that one family member has sued another and then both have sought to reform an insurance contract to afford coverage for the initial lawsuit. The circumstances are, to say the least, suspect. We are not permitted, however, to substitute our judgment for that of the trial judge unless we are prepared to declare that his decision was contrary to the manifest weight of the evidence. After a thorough review of the record we cannot say that the trial court's holding was against the manifest weight of the evidence. As we have noted, the determination of whether or not reformation should be granted turned on the credibility of two parties, Cheryl Hanson and

Marvin Blanton. The testimony of Miss Hanson, if believed, established a mutual mistake of fact common to both parties at the inception of the contract. She informed Mr. Blanton that she wanted protection against the claims of both third persons and her passengers. She also informed him that her brothers and sisters were her most frequent passengers. According to Miss Hanson, Mr. Blanton assured her that "if somebody were injured" her insurance would cover it and that she would be protected in a suit brought by one of her passengers. A situation was created, therefore, where reformation was in order. *Stoltz v. National Indemn. Co.* (1952), 345 Ill.App. 495, 104 N.E.2d 320; *Swan v. Allstate Insurance Co.* (1967), 89 Ill.App.2d 205, 232 N.E.2d 491.

■■ State Farm has suggested that because Miss Hanson's conversation with Mr. Blanton had taken place four years prior to the trial, her testimony was inherently improbable. However, we note that while Miss Hanson testified to the specific details of this conversation, Mr. Blanton could only remember it "vaguely". The credibility of each witness was for the trial judge to determine.

State Farm has also urged that reformation should be denied because Miss Hanson read the policy in 1966, was aware of the household exclusion, and yet never questioned Mr. Blanton about it when the policy was renewed in 1967. A careful examination of the record does not disclose that Miss Hanson specifically understood the nature of this exclusion. It is also unclear as to whether or not she actually read the exclusion word for word. Again, we cannot hold on the basis of this record that the trial court's decision was against the manifest weight of the evidence.

Because of the decision we have reached on the question of reformation we feel it unnecessary to consider in detail the contention of the defendants that the court below erred in failing to hold State Farm and its agent guilty of negligence. We have examined the record and can find no basis upon which a finding of negligence could be predicated.

Judgment affirmed.

CRAVEN, P. J., and SMITH, J., concur