AMERICAN EMPLOYERS INSURANCE COMPANY, Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, LIMITED, Defendant.

Civ. A. No. 74–13–P.

United States District Court, N. D. West Virginia, Parkersburg Division.

Sept. 6, 1977.

Daniel A. Ruley, Jr., Wilson & Ruley, Parkersburg, W. Va., Hill, Rivkins, Carey, Loesberg & O'Brien, New York City (Andrew R. Colmant, New York City, of counsel), for plaintiff.

Richard Gregory McNeer, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W. Va., and Grogan, Graffan & McGinley, Pittsburgh, Pa., for defendant.

## OPINION

MAXWELL, Chief Judge.

On January 7, 1972, the petroleum barges MOS 101 and MOS 103, in the tow of the M/V MARTIN, exploded while passing beneath the Baltimore and Ohio Railroad Company bridge which spans the Ohio River between Parkersburg, West Virginia, and Belpre, Ohio. Two of the crewmen were killed, both barges were destroyed, and there was substantial damage to the bridge and to property in Parkersburg and Belpre.

The tow was owned and operated by Mel Joy Transportation Company, Inc., an Illinois corporation (hereinafter referred to as Mel Joy). Mel Joy sought exoneration from or limitation of liability in an action brought in this Court pursuant to 46 U.S.C. §§ 183–185. This Court denied the petition and held that Mel Joy was liable for the accident and the resulting damages. All of the claims in the limitation action have been settled or otherwise disposed of, and that action has been dismissed.

This is an action involving a dispute between two of Mel Joy's insurers. The plaintiff, in settlement of the damage claims, has paid $2,650,103.65, and the defendant has paid $554,400.00. The plaintiff contends that it is entitled to recover from

the defendant $1,008,800.00 (plus interest and costs), this being the additional amount the plaintiff asserts the defendant was liable for under the terms of its policy. It is uncontroverted that the defendant's policy, as written, provides the amount of coverage asserted by the plaintiff. The defendant contends, however, that its policy, because of mutual mistake, does not reflect the coverage actually agreed upon, and that it is entitled to the equitable relief of reformation.

The Court has jurisdiction of the action as an admiralty and maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure, and by virtue of the diversity of citizenship of the parties and amount in controversy, 28 U.S.C. § 1332.

The facts of this case, though somewhat complicated, are, in large part, uncontroverted. The following narrative will set forth those facts, either as stipulated, or as the Court finds them to be from the evidence, and the Court's conclusions of law thereon, pursuant to Rule 52(a), Federal Rules of Civil Procedure.

In January, 1971, Robert Buschek, a Director and the Secretary-Treasurer of Mel Joy, was aware that the premiums for its existing protection and indemnity insurance, which was due to expire on April 30, 1971, would be substantially increased as the result of a major accident which had occurred in 1969. Mr. Buschek contacted Marsh & McLennan, Incorporated (hereinafter referred to as Marsh & McLennan), insurance brokers, for the purpose of obtaining other protection and indemnity coverage. He was interested in obtaining primary coverage in the same amount as that provided in the existing policy and additional coverage of $10,000,000.00, and sought to save as much as possible on the premium costs.

Mr. Buschek spoke with Wayne Pearson, an account executive at Marsh & McLennan. Mr. Pearson obtained the information for completion of an "Umbrella Excess Liability Questionnaire" (application), and he or someone else at Marsh & McLennan contacted Stewart, Smith Mid America, Inc.

(hereinafter referred to as Stewart, Smith), a sub-broker, to obtain premium cost quotes on $10,000,000.00 of Umbrella coverage over the underlying coverages and limits described in the application.

By letter dated February 5, 1971, Stewart, Smith bound American Employers Insurance Company (hereinafter referred to as American), the plaintiff, as of February 1, 1971, for $5,000,000.00 Umbrella Liability "excess of underlying limits as specified in your application" and also bound an additional $5,000,000.00 Umbrella Liability with First State Insurance Company, Boston, Massachusetts, effective the same date. The American policy was issued on February 22, 1971.

Shortly after the Umbrella Liability coverage was bound, Mr. Pearson asked Thomas Bickel, an accounts man in the Marine Department at Marsh & McLennan, to check the Mel Joy application to see if it was accurate and in good order. Mr. Bickel's examination disclosed a so-called "gap" in the existing primary coverage (which was with Marine Office-Appleton & Cox Corporation, hereinafter referred to as MOAC, and which, as noted earlier, was due to expire April 30, 1971). The "gap" existed because each vessel was insured separately (two barges for $122,200.00 each, two barges for $100,000.00 each, the MARTIN for $200,000.00, and a dock barge for $10,000.00), and the total coverage of $654,400.00 would exist only if all the vessels were involved in a single accident. In order to cover the "gap" it was determined that an excess protection and indemnity policy should be obtained.

On February 18, 1971, Mr. Bickel telephoned Victor P. Simone, Regional Manager, Ocean Marine Department of St. Paul Fire and Marine Insurance Company, Limited (hereinafter referred to as St. Paul), the defendant, to obtain a quotation on the excess protection and indemnity coverage. The following day, Mr. Simone gave Mr. Bickel a premium quote of $2765.00 if tower's liability coverage was included and $2400.00 if this coverage was excluded. In neither of the conversations between

Messrs. Bickel and Simone was there any specific mention of whether the coverage sought was on a "per vessel" or "per occurrence" basis. Mr. Bickel testified that it was his intention, in seeking quotations for the excess protection and indemnity coverage, to obtain coverage of $654,400.00 "any one occurrence primary and excess combined." Mr. Simone testified that he wrote this class of insurance (excess protection and indemnity) only on a "per occurrence" basis, and that his underwriting limit for this class of insurance, $2,000,000.00, would have been exceeded had he agreed to write the insurance on a "per vessel" basis.

In computing the premium, Mr. Simone utilized an advisory rate table known as the London Rate Schedule, which had been promulgated by Peter Green, a London underwriter with a box at Lloyd's. The $2400.00 premium quoted discounted by one-half the premium rate reflected in the London Rate Schedule. There was conflicting testimony on the question of whether the London Rate Schedule is intended to apply to "per occurrence" or "per vessel" coverage, and the most persuasive evidence is that it is neither, but rather is only a guideline that underwriters utilize in determining the premium rates that they will charge for excess protection and indemnity insurance.

Mr. Bickel also sought a quotation from Insurance Company of North America, but that company wanted additional underwriting information, including a premium and loss history for the preceding five years and an up-to-date survey on the vessels to be insured, prior to giving a quotation.

The premium quoted by Mr. Simone was submitted to Mr. Buschek through Messrs. Bickel and Pearson. Mel Joy accepted the premium quoted and Mr. Bickel telephoned Mr. Simone and instructed him to bind the coverage as of 12:00 noon on February 24, 1971. This was done.

Following receipt of the instructions to bind the coverage, Mr. Simone gave his notes to Oliver Parchois, an underwriting trainee, and directed him to prepare a policy underwriting order. Mr. Parchois prepared that document, from which the policy was typed. Mr. Simone received the policy and countersigned it. This was done on February 24, 1971, with the effective date at 12:00 noon on that day. Mr. Simone delivered the policy to Mr. Bickel, who also reviewed the policy prior to delivering it to Mel Joy. Neither Mr. Simone nor Mr. Bickel noted typographical errors in the policy in columns A and B on page 3 opposite M/V MARTIN ($434,400.00 should have been $454,400.00 and $100,000.00 should have been $200,000.00), and these errors were somehow corrected after the policy was delivered to Mel Joy. More importantly, neither Messrs. Simone nor Bickel noted that in the "Amount Insured" and "Limit of Liability" sections of the policy, the words "As Per Schedule" were written. This made the policy one which provided "per vessel" coverage. The inclusion of the figure $554,000.00 rather than "As Per Schedule" would have made the policy one providing "per occurrence" coverage, which the defendant contends was the intention and agreement between Messrs. Bickel and Simone.

A primary protection and indemnity policy replacing the MOAC policy was issued by Northwestern National Insurance Company (hereinafter referred to as Northwestern), formerly a defendant in this case, on June 22, 1971, effective May 1, 1971. This policy was in the total amount of $410,000.00 ($200,000.00 on the MARTIN, $100,000.00 each on barges MOS 101 and MOS 103, and $10,000.00 on a dock barge), with a $5,000.00 deductible per occurrence.

The explosion at Parkersburg occurred on January 7, 1972, and the policies issued by Northwestern, American, and St. Paul were in effect at that time. The wrecks of the barges MOS 101 and MOS 103 constituted a menace to navigation and had to be removed. Mel Joy entered into a contract with a salvor for the removal of the wrecks, and this was accomplished at a cost of $278,413.65. Northwestern, pursuant to the terms of its policy, paid $195,000.00 of the cost of removal, and St. Paul paid the balance of $83,413.65.

On February 23, 1972, some forty-seven days after the accident, representatives of the various underwriters met in New York to discuss the loss. Among those attending this meeting were Mr. Charles Dyson, on behalf of American, and Mr. Simone, on behalf of St. Paul. Mr. Dyson had obtained a copy of the Northwestern and St. Paul policies and had studied them prior to the meeting. Mr. Dyson told Mr. Simone that it was his opinion that because all three vessels were involved in the accident, under the terms of the St. Paul policy, its coverage would be in the total amount of $1,563,200.00, i. e., $554,400.00 on each of the barges and $454,400.00 on the MARTIN. Mr. Simone disagreed, stating that St. Paul was liable for only $554,400.00. Mr. Dyson reiterated his position as to St. Paul's liability in a letter to Mr. Simone on February 25, 1972. Mr. Simone responded by telephone, maintaining his earlier position as to St. Paul's liability. At this time, Mr. Simone was unaware of the fact that the St. Paul policy as written constituted "per vessel" insurance.

During the course of the limitation action, counsel for St. Paul (Stephen W. Graffam) and counsel for American (Andrew R. Colmant), both of whom represented Mel Joy, recognized that there was a dispute as to the coverage provided by the St. Paul policy, and they agreed that resolution of that dispute would be postponed until after the conclusion of the limitation action so as not to affect the spirit of cooperation then existing among the underwriters.

The limitation action was tried in March, 1974, and this Court's opinion denying the petition was filed on April 5, 1974. An interlocutory decree was entered, and shortly thereafter the instant action was commenced.

The damage phase of the limitation action was referred to a Special Master. The largest single claim was that of the B & O. On January 31, 1975, American and St. Paul settled the B & O claim by paying the B & O $3,150,000.00. Of this sum, St. Paul paid $470,986.35, which, together with the $83,413.65 previously paid to the salvor for the removal of the barges, made St. Paul's total payment $554,400.00, the full amount of coverage it contends was intended to be provided by its policy. American paid the balance of the B & O settlement. American, St. Paul, and Northwestern agreed that the payment of the B & O claim was not prejudicial to any of the rights of the respective underwriters in this action, and that the settlement and/or payment did not waive any of the defenses set forth in the action. The remaining claims were settled or otherwise disposed of as of January, 1976, and there is no controversy between the parties to this action as to the amounts of the payments made or other dispositions.

From all that has been thus far stated, it is apparent that the plaintiff, at the time that its coverage was bound and its policy issued, did not and could not have relied on any representation that there was more than $654,400.00 maximum exposure per occurrence of underlying coverage. To the contrary, the evidence is quite clear that the plaintiff's first knowledge that the defendant's policy, as written, provided "per vessel" coverage was shortly before the underwriter's meeting earlier alluded to, when Mr. Dyson made this discovery in his examination of the underlying (Northwestern and St. Paul) policies.

Mr. Dyson's discovery of the type of coverage provided by the St. Paul policy played a significant role in American's handling of this matter.

The initial consideration affected by the coverage afforded by the St. Paul policy was in the setting of American's reserve for this loss. As American interpreted the underlying coverage, Northwestern provided $400,000.00 coverage and St. Paul was liable for $1,563,200.00, making a total of $1,963,200.00. The estimated loss, as of the meeting of underwriters in February, 1972, was $2,500,000.00. Mr. Dyson, using round figures, initially, therefore, set up a reserve of $600,000.00.

The reserve established for the loss was important in several respects, not the least of which was the obligation imposed on American to notify its reinsurers of their possible exposure.

The $5,000,000.00 of coverage provided by American was heavily, in fact, almost totally, reinsured. The first $500,000.00 of American's coverage was reinsured to the extent of 47.5% by Employers Surplus Line Insurance Company (ESLIC). The remaining 52.5% of the first $500,000.00 was reinsured by Associated International, as part of its agreement to insure 52.5% of the first $2,000,000.00 of the American policy. The Multiple Line Reinsurance Treaty (MLRT) covered the remaining 47.5% of $1,500,000.00 after the first $500,000.00. Thus, the first $2,000,000.00 was completely reinsured. At the $2,000,000.00 level the Old Neal Treaty came into play. This Treaty covered two-thirds of the remaining $3,000,000.00 of American's coverage.

American was obligated to notify its reinsurers if a given loss was likely to reach a level exposing their coverage. As can readily be seen, the initial estimated exposure of American, reflected in its initial $600,000.00 reserve, required notification to ESLIC, Associated International, and MLRT but did not require notification to the Old Neal Treaty.[1]

American increased its reserves to $1,600,000.00 in November, 1973. This increase was based upon an increase in the projected damages. At this point, the Old Neal Treaty was still not notified of its possible exposure, although this would have been required had St. Paul's contention as to its limit of liability been accepted.

In April, 1974, Mel Joy's petition for exoneration from or limitation of liability was denied, and an interlocutory decree was entered in early June. American then notified the Old Neal Treaty of its probable exposure, although the reserve was not actually increased until October, 1974, when it was raised to $3,600,000.00.

The notice of possible exposure, or the lack thereof, to the Old Neal Treaty was significant in two respects. First, non-notification by American in 1972 resulted in a favorable premium-loss ratio for that year, as the result of which American received in 1973 (for 1972) a contingent profit commission of $187,795.00. Secondly, during the summer of 1972 American was negotiating a New Neal Treaty to replace the existing treaty and was able, because of the good premium-loss ratio, to obtain a better commission contingent term and a better contingent net profit in the new reinsurance treaty.

When American notified the Old Neal Treaty of its probable exposure in the Parkersburg loss in June, 1974, the Old Neal Treaty asked American to recalculate the contingent profit commission for 1972. Upon doing so, American found that it would be required to return the full $187,795.00. Of this amount, $153,145.00 was attributable to the Parkersburg loss, and the balance of $34,650.00 was attributable to adjustments for other, older losses which had not been reported for 1972. The $187,195.00 was paid back to the Old Neal Treaty in 1975, and American was not required to pay any penalty or interest on these funds, of which it had had the use and benefit from 1973–75.

When the New Neal Treaty was renegotiated, at more favorable terms to American, some companies participating in the Treaty changed, but no participant withdrew as a result of the Parkersburg explosion.

There is evidence in the record that it is common for adjustments to be made to contingent profit commissions for many, many years after the insured year, primarily as the result of late reporting, underestimation of the amount of a loss or decision in pending litigation. In fact, the evidence shows that if the plaintiff prevails in this action, the contingent profit commission for 1972 would again be readjusted, and the plaintiff would receive $82,919.00.[2]

---

1. It should be noted that even had American accepted St. Paul's position that its limit of liability was $554,400.00, American's exposure at this time, based on the initial estimate of the damages, would have been $1,545,600.00, substantially less than the $2,000,000.00 level at which notification to the Old Neal Treaty would have been mandated.

2. It should be noted at this point that if the plaintiff prevails here, the recovery would not

American contends that it was entitled to, and did, rely on the terms of the St. Paul policy in setting its reserves and in its dealings with its reinsurers, the effects of which have just been described. American also asserts that the evidence is insufficient to establish the existence of mutual mistake, and that any claim by St. Paul as to the existence of mutual mistake should be barred by laches. Consequently, American takes the position that St. Paul should be held to its policy as written.

St. Paul claims that American is seeking in this action to take advantage of a clerical error in the preparation of its policy and that there is clear and convincing evidence that the policy did not reflect the parol negotiations and agreement between Mel Joy's agent, Marsh & McLennan, and Mr. Simone on behalf of St. Paul. It contends that American did not rely on the existence of more than $654,400.00 underlying coverage when it issued its policy, and that American should not be permitted to claim that it relied to its detriment on the terms of the St. Paul policy. Rather, St. Paul claims that American had early notice of the St. Paul position as to its liability, which it chose to ignore in order to obtain the benefit of an increased contingent profit commission and better terms on renegotiation of the Neal Treaty. Finally, St. Paul denies that its claim of mistake in the drafting of its policy, upon which its prayer for reformation is based, was not timely asserted.

The issues presented in this action are governed by the law of Illinois, where all the contacts between the contracting parties and their agents took place. This result obtains regardless of whether the case is viewed as one of admiralty jurisdiction, *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313–14, 75 S.Ct. 368, 99 L.Ed. 337 (1955), *rehearing denied,* 349 U.S. 907, 75 S.Ct. 575, 99 L.Ed. 1243 (1955); *Bell v. Tug Shrike,* 332 F.2d 330 (4th Cir. 1964), *cert. denied,* 379 U.S. 844, 85 S.Ct. 84, 13

L.Ed.2d 49 (1964); or of diversity jurisdiction, *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Galloway v. Std. Fire Ins. Co.,* 45 W.Va. 237, 240, 31 S.E. 969 (1898).

■ Under Illinois law, the equitable relief of reformation of a written instrument is available where, because of a mutual mistake of fact, the instrument fails to express the real agreement between the parties. *Mahon v. State Farm Mutual Ins. Co.,* 36 Ill.App.2d 368, 184 N.E.2d 718 (1962); *State Farm Mutual Ins. Co. v. Hanson,* 7 Ill.App.3d 678, 288 N.E.2d 523 (1972).

■ The equitable remedy of reformation serves not to make a new agreement for the parties but to establish and perpetuate the true existing one by making the instrument express the real intent of the parties. *Harley v. Magnolia Petroleum Co.,* 378 Ill. 19, 37 N.E.2d 760 (1941).

■ In an action for reformation based on mutual mistake, there is a presumption arising from the instrument itself that it sets forth fully and correctly the true agreement of the parties. The party alleging the mistake has the burden of proving that the mistake was made and was mutual, with the consequence that the true agreement or intention of the parties is not reflected in the instrument and also to establish what the true agreement or intention was. 66 Am.Jur.2d *Reformation of Instruments* § 117 (1973).

■ Parol evidence is admissible in an action for reformation grounded on mistake. *Mahon, supra,* 184 N.E.2d at 722 (1962); *Koch v. Streuter,* 218 Ill. 546, 75 N.E. 1049 (1905); 13 Williston on Contracts § 1552 (3d. ed. 1970).

■ The party seeking reformation of an instrument is required to prove his case by very strong, clear, and convincing evidence. *State Farm Mutual Auto. Ins. Co. v. Han-*

---

be paid by the defendant but by *its* reinsurers because the defendant had an automatic rein-

surance treaty which came into effect at the $550,000.00 level.

*son, supra,* 7 Ill.App.3d at 681, 288 N.E.2d 523.

■ In support of its claim for reformation, the defendant presented evidence which has been previously mentioned but which will be discussed in greater detail here.

First, Mr. Bickel testified that when he contacted Mr. Simone to obtain a premium quotation on the excess protection and indemnity policy, it was his intention to cover the "gap" earlier referred to and to obtain a total coverage of $654,400.00 primary and excess combined, so as to bring the coverage up to the level of the umbrella coverage. He also testified that he did not specify that the coverage sought was either per occurrence or per vessel because the practice at Marsh & McLennan was to obtain excess protection and indemnity insurance on a per occurrence basis and that, if per vessel coverage was sought, it would be mentioned specifically.

Mr. Simone testified that St. Paul was, at the time in question, writing excess protection and indemnity insurance only on a per occurrence basis, and that he had communicated this information to the brokers with whom he dealt, including Marsh & McLennan. This explained, he said, why there was no indication in his notes of Mr. Bickel's call as to whether the coverage was per vessel or per occurrence and why there was no discussion of this matter. Further, he indicated that to write this particular policy on a per vessel basis would have put him over his underwriting limit of $2,000,000.00 on this class of insurance. Additionally, Mr. Simone testified that he interpreted the London Rate Schedule, which he used as a guide in setting the premium quoted, as being applicable to per occurrence coverage.

The letter from Stewart, Smith binding American (and First State) indicated the coverage was "excess of underlying limits as specified in your application" and the American policy itself indicated the underlying protection and indemnity limits of liability was "$654,400.00 each claim."

The evidence which the Court must consider as being contrary to the defendant's position is as follows.

First, there was admittedly no mention whatsoever in the conversations between Messrs. Bickel and Simone as to whether the coverage was to be per vessel or per occurrence. Thus, for their agreement to have been that the coverage would be per occurrence, it would seem that each had to know what was in the other's mind. In order for this to be plausible, the evidence would have to show that (1) these two gentlemen had previously communicated to one another that it was a well-established practice to obtain, on the one hand, and write, on the other, this class of insurance on a per occurrence basis unless otherwise specified or (2) that there was a custom and usage in the industry to write this class of insurance only on a per occurrence basis unless otherwise specified.

Although Mr. Simone testified that he had told Mr. Bickel and other brokers that he only wrote excess protection and indemnity on a per occurrence basis, he could not recall whether this had been communicated to Mr. Bickel in connection with this policy or previous to it, or under what circumstances. He had had only one other transaction of this nature with Mr. Bickel, a few months before this one. There is no evidence that Mr. Bickel had communicated to Mr. Simone the information that quotes sought for this kind of insurance would be for per occurrence coverage unless otherwise specified.

Although Mr. Bickel did not state in precise words that there was a custom and usage in the industry to write excess protection and indemnity insurance on a per occurrence basis, that was certainly the implication from his testimony that " . . . mostly in the absence of any agreements to the contrary, most underwriters would go on the per occurrence basis." On cross-examination, Mr. Simone testified it was St. Paul's company policy to write this class of insurance only per occurrence and that the form on which the policy was prepared, if used properly, was a per occurrence form.

This detailed discussion is significant because the plaintiff called two witnesses, Joseph Romans and Dale E. Taylor, who testified that (1) there is no custom and usage in the industry to write excess protection and indemnity insurance on a per occurrence, rather than a per vessel, basis and (2) that the London Rate Schedule is not a per occurrence rate table. Messrs. Romans and Taylor were called as rebuttal witnesses over the defendant's objection that they should not be permitted to so testify because the matters covered by their testimony and particularly the first area, were not covered in the defendant's direct evidence. The Court is of the opinion, however, that these matters were so closely intertwined with the defendant's theory of its case and evidence offered in support of it that the plaintiff was entitled to present testimony in rebuttal.

With regard to the Stewart, Smith letter and the reference in the American policy to underlying coverage of $654,400.00 each claim, these matters have been discussed earlier herein and will not be gone into further here.

There are other items of testimony and evidence that could be referred to, but they would not alter the sum and substance of the Court's decision.

Upon consideration of all of the evidence, the Court is not satisfied that there was any specific mutual intention formed between Mr. Bickel on behalf of Marsh & McLennan, Mel Joy's agent, and Mr. Simone on behalf of St. Paul, as to the type of coverage to be provided by the St. Paul policy. In other words, the Court does not find that the evidence presented establishes clearly and convincingly a variance between the oral negotiations and agreement and the written policy of insurance memorializing the same.

St. Paul has asserted, in the alternative, that it has discharged its obligation under its policy because the stripping and/or venting of barge MOS 101 was the sole cause of the accident, i. e., that only one vessel was responsible for the accident. The Court does not believe it appropriate to consider this contention herein. The opinion in the limitation action speaks for itself, and the Court will not alter, modify, or interpret that opinion which is, in essence, collaterally attacked by the defendant.

Accordingly, and for the reasons set forth above, the defendant's claim for reformation is denied, as is its claim for relief based on the alternative contention that only barge MOS 101 caused the accident.