AMERICAN EMPLOYERS INSURANCE COMPANY, Appellee,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY LIMITED, Appellant.

No. 77–2564.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 15, 1978.

Decided March 8, 1979.

Stephen W. Graffam, Pittsburgh, Pa. (Jerome W. Kiger, Grogan, Graffam, McGinley & Solomon, Pittsburgh, Pa., R. Gregory McNeer, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W. Va., on brief), for appellant.

Andrew R. Colmant, New York City (Bruce J. Hector, Hill, Rivkins, Carey, Loesburg & O'Brien, New York City; Morris & Ruley, Parkersburg, W. Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BUTZNER and HALL, Circuit Judges.

BUTZNER, Circuit Judge:

The principal issue raised in this appeal is whether the district court erred by denying reformation of an insurance policy. Because the policy did not reflect the mutual intention of the insured and the insurer, and because no third party relied to its detriment on the mistake in the policy, we reverse the judgment of the district court and remand for reformation.

## I

The dispute arises out of a 1972 explosion of the petroleum barges M.O.S. 101 and M.O.S. 103 on the Ohio River. The barges, owned by the MelJoy Transportation Company and under tow by MelJoy's towboat, the M.V. Martin, were passing under a railroad bridge when the accident occurred. The explosion killed two crewmen and damaged the bridge and other property. In 1974 litigation, the court found MelJoy liable and denied its petition for limitation of

liability.[1] MelJoy's insurance carriers then settled the various damage claims for more than $3,000,000. American Employers Insurance Co. subsequently brought this action against St. Paul Fire & Marine Insurance Co. for $1,008,800, the difference between St. Paul's liability under its policy as written and St. Paul's contribution to the settlements.[2] Jurisdiction is founded on diversity of citizenship, and Illinois law controls.

At the outset, we accept the district court's ruling that three MelJoy vessels were involved in the accident. Since three vessels were involved, the decisive question is whether St. Paul's maritime excess liability policy, which on its face provided coverage for the three vessels aggregating $1,563,200, should be reformed to provide not more than $654,400 excess coverage for each occurrence, regardless of the number of vessels involved. The district court denied reformation. It held that the coverage was per vessel and that St. Paul was obligated to contribute $1,563,200 to the settlement. This sum is $1,008,800 more than St. Paul has actually paid. St. Paul contends that the coverage was per occurrence, and that consequently, it has discharged its obligation under the policy by paying $554,400.

An appreciation of the chronology of events is essential in order to understand the case. In January, 1971, MelJoy had a primary liability insurance policy that insured each of the company's six vessels separately. The M.V. Martin was insured for $200,000; the barges M.O.S. 101 and M.O.S. 103 were each insured for $100,000; two other barges were each insured for $122,200; and MelJoy's dock barge was insured for $10,000. Thus, MelJoy had $654,400 in liability coverage for any accident in which all six of its vessels were involved, and smaller amounts of coverage if fewer than six vessels were involved. MelJoy decided to obtain insurance that would indemnify it up to $10,000,000 for damage caused by its vessels. The secretary-treasurer of

MelJoy therefore contacted Marsh & McLennan, Inc., an insurance broker, and instructed the firm to secure coverage of $10,000,000. He left the details to be worked out by Marsh & McLennan.

On February 5, 1971, Marsh & McLennan obtained umbrella coverage of $10,000,000 for MelJoy effective as of February 1, 1971. American wrote the first $5,000,000 of the umbrella coverage in a policy issued February 22, 1971, effective February 1, 1971. American's policy required underlying coverage (or self-insurance) of $654,400 per occurrence. Marsh & McLennan then requested Thomas Bickel of its marine department to review MelJoy's insurance.

Bickel's analysis disclosed a problem. Because of the requirement for underlying coverage of $654,400 in the umbrella policy, MelJoy was uninsured for the difference between the umbrella coverage and the per vessel primary coverage. The precise amount of MelJoy's exposure depended on the extent of liability and on which vessels were involved, but the gap could be substantial. For example, in an accident involving only the barge M.O.S. 103, MelJoy would have been uninsured for $554,400, the difference between the $654,400 underlying coverage required by the umbrella policy and the $100,000 primary coverage on that barge.

On February 18, 1971, Bickel spoke with Victor Simone, the regional manager of the Ocean Marine Department at St. Paul Fire & Marine Insurance Company. Bickel informed Simone of the problem of the gap between the primary and umbrella insurance. Simone quoted a premium of $2,400 for excess insurance. After receiving MelJoy's approval, Bickel called Simone and bound the excess coverage effective February 24, 1971. The printed policy, however, which was completed by a St. Paul underwriting trainee and countersigned by Simone, provided for per vessel coverage. The per vessel coverage was expressed, not

---

1. *In re MelJoy Transportation Company,* 1974 A.M.C. 1293 (N.D.W.Va., April 5, 1974).

2. The district court's opinion in the case now on appeal is reported in 436 F.Supp. 873 (N.D. W.Va.1977).

in so many words, but by the notation "as per schedule" instead of "$654,400" in the blanks for "amount insured" and "limit of liability." [3]

In May, 1971, MelJoy replaced its primary insurance with a policy written by the Northwestern National Insurance Company, which was identical in its coverage of the towboat and the two barges. Thus, when the accident occurred on January 7, 1972, MelJoy had the following coverage: primary insurance of $400,000 from Northwestern on the three vessels that were involved in the accident;[4] excess insurance provided by St. Paul, in the maximum amount of either $1,563,200 or $554,400, depending on the resolution of the respective contentions of American and St. Paul; and American's $5,000,000 umbrella policy that required underlying insurance in the amount of $654,400; and an additional $5,000,000 umbrella policy which is not involved in this litigation.

One of St. Paul's defenses was that its written policy did not accurately reflect its agreement with MelJoy, and it sought reformation of the policy to reflect per occurrence coverage. St. Paul proved that at the time MelJoy purchased the policy, each party to the contract understood that the insurance would be on a per occurrence basis. Bickel and Simone each intended to bind per occurrence coverage. Each testified to that intention, and each explained why he

understood the coverage to be per occurrence.

Bickel, MelJoy's representative, testified that he intended only to fill the gap between the primary and umbrella coverage with a maximum exposure of $554,400. He considered the premium charged by St. Paul to be reasonable for this coverage. The evidence discloses no reason why he would have desired to purchase coverage duplicating that which he had already obtained in American's umbrella policy.

Simone, St. Paul's regional manager, explained that his company wrote excess insurance only on a per occurrence basis for the type of risk involved, unless the insured specifically requested per vessel coverage. He testified that he could not have intended to write per vessel coverage because such a policy would have exceeded his company's limit for this class of business. He also explained how the mistake in the policy originated with the underwriting trainee. In February, 1972, soon after the explosion, when the underwriters convened to discuss the loss, Simone informed American that St. Paul's coverage was per occurrence.

American, however, relied primarily on uncontroverted evidence that (1) neither Bickel nor Simone specifically mentioned to each other in the course of the negotiations that the coverage was to be per occurrence, and (2) the industry did not have a custom of writing excess coverage on a per occurrence basis. American also argued that, in

---

**3.** "Schedule" refers to the "Schedule of Underlying Insurances" that is contained in the policy. That schedule provides in pertinent part:

This insurance shall cover only those coverages specified in paragraph 2, for not exceeding the amounts specified under "Sum Insured" below in column "A", being excess of "Primary" amounts specified in column "B" (which are deemed to be recoverable by the Assured) but subject to terms and conditions otherwise specified herein. . . .

| Location or vessel | Applicable Coverage | Column A Sum Insured | Column B Primary |
|---|---|---|---|
| 1) M. V. Martin | As per underlying policies attached to company's file | $454,400.00 | $200,000.00 |
| 2) Barge "M.O.S. 101" | As per underlying policies attached to company's file | $554,400.00 | $100,000.00 |
| 3) Barge "M.O.S. 103" | As per underlying policies attached to company's file | $554,400.00 | $100,000.00 |

---

**4.** Ultimately, Northwestern settled by paying $195,000. This sum combined with St. Paul's contribution of $554,400 exceeded the requirement of $654,400 of underlying insurance.

any event, it had relied to its detriment on the St. Paul policy.

## II

St. Paul assigns as error the district court's legal criteria for reformation. On this subject, the court said:

[T]here was admittedly no mention whatsoever in the conversations between Messrs. Bickel and Simone as to whether the coverage was to be per vessel or per occurrence. Thus, for their agreement to have been that the coverage would be per occurrence, it would seem that each had to know what was in the other's mind. In order for this to be plausible, the evidence would have to show that (1) these two gentlemen had previously communicated to one another that it was a well-established practice to obtain, on the one hand, and write, on the other, this class of insurance on a per occurrence basis unless otherwise specified or (2) that there was a custom and usage in the industry to write this class of insurance only on a per occurrence basis unless otherwise specified. 436 F.Supp. at 880.

The court acknowledged the testimony of the insured and the insurer that each intended to bind per occurrence coverage. 436 F.Supp. at 880. It also took note of the undisputed evidence which explained and corroborated the intent of both the insured and the insurer to provide per occurrence coverage. 436 F.Supp. at 875, 880. Because of its view of the applicable principles of equity, however, the court refused to accord this evidence controlling weight. After concluding that it was "not satisfied that there was any specific mutual intention formed" between the parties as to the type of coverage to be provided by the St. Paul policy, the court denied reformation. 436 F.Supp. at 881.

A leading commentary, 13A Appleman, Insurance Law and Practice § 7607 (1976), explains the law as follows:

The general rules applying to the reformation of other written contracts apply to contracts of insurance, the courts will reform an insurance policy, like any other instrument, to effectuate the intention of the parties, and make it set forth correctly the contract upon which the minds of the parties met, and equity jurisdiction applies to insurance policies as well as to other agreements. And, like other contracts, fraud, mutual mistake, or accident may give good ground for reformation.

For reformation to be allowed on the basis of mutual mistake, the same commentary goes on to say, § 7608 at 309:

[T]he law requires that the alleged mistake must have occurred through the reduction of the understanding and agreed intent of the parties to writing, so that the written instrument does not represent the real agreement.

The Restatement of Contracts, § 504 (1932), sets forth the critical test of "identical intention":

[w]here both parties have an identical intention as to the terms to be embodied in a proposed written . . . contract . . . and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby.

There are thus three basic prerequisites for reformation of an insurance policy on the ground of mutual mistake: a bargain between the parties; a written instrument supposedly containing the terms of that bargain; and a material variance between the mutual intention of the parties and the written instrument. *See* Covington, Reformation of Contracts of Personal Insurance, 1964 Ill.L.F. 543, 549. These elements must be proved by "very strong, clear and convincing evidence." *State Farm Mutual Automobile Ins. Co. v. Hanson*, 7 Ill.App.3d 678, 288 N.E.2d 523, 526 (4th Dist. 1972).

St. Paul argues that the testimony of both parties to the contract that they intended to have per occurrence coverage is sufficient to warrant reformation unless American can prove detrimental reliance on

the written agreement. For support, it cites three Illinois decisions, *State Farm Mutual Automobile Ins. Co. v. Hanson*, 7 Ill.App.3d 678, 288 N.E.2d 523 (4th Dist. 1972); *Swan v. Allstate Ins. Co.*, 89 Ill. App.2d 205, 232 N.E.2d 491 (1st Dist. 1967); and *Mahon v. State Farm Mutual Automobile Ins. Co.*, 36 Ill.App.2d 368, 184 N.E.2d 718 (1st Dist. 1962). Each of these cases indicates that reformation depends on what both parties to the contract intended. For example, in *Hanson*, the court said:

> [T]o reform an insurance contract on the ground of mutual mistake the party seeking the reformation must establish a mutual mistake of fact, not of law, which was common to both parties to the contract and was in existence at the time the contract was executed. The party attempting reformation must prove, in essence, that both parties to the instrument intended to say a certain thing but because of mutual factual mistake said something different. 288 N.E.2d at 525–26.

This accords with § 504 of Restatement of Contracts which requires only that both parties have an "identical intention" at variance with the written contract.[5]

American, however, points out that in each of these cases, the court actually relied upon evidence of discussions between the insured and the insurer's agent. In each case, the insured testified that (1) he had instructed the agent to provide certain coverage, (2) the agent had indicated he would do so, and (3) the written policy failed to reflect that agreement. *Hanson*, 288 N.E.2d at 527–29; *Swan*, 232 N.E.2d at 492; *Mahon*, 184 N.E.2d at 720–22. American asks us to conclude that the district court correctly denied reformation upon finding a lack of communicated intent or of a custom in the industry concerning per occurrence coverage.

■ We think that the Illinois decisions cited by St. Paul require reformation. American misconstrues the role of evidence of communicated intent in those cases. Unlike the case at bar, each of the cited cases involved a dispute between the parties to a contract of insurance about what they actually intended in their contract. The courts necessarily looked to evidence of what the parties said or did at the time they entered into the contract. The courts did so not as an end in itself, but as the best means of determining the parties' intent. Thus, in *Swan*, the court, in accepting the insured's version of controverted assertions of mutual intent, stressed that the intentions of the two parties were "manifested" by the express directions of the insured to the insurer's agent. 232 N.E.2d at 495. The colloquy of the parties was simply evidence of their mutual intent, not the essence of that intent.

■ An inquiry such as that undertaken in *Swan* is only one means of determining the mutual intention of the parties. In other contexts, courts routinely determine the mutual intention of contracting parties without any evidence that their intent was mutually expressed or that there was a relevant custom or usage in the trade. *See, e. g., Fox v. Fox Valley Trotting Club*, 8 Ill.2d 571, 134 N.E.2d 806, 810 (1956). Consequently, where, as here, the insured and the insurer both credibly testify that they intended to have insurance providing coverage different from that in the written policy, the court must reform the policy to conform to their mutual intention unless a third party relied to its detriment on the written agreement or the contracting parties acted fraudulently.

### III

■ The district court found that American "at the time that its coverage was bound and its policy issued, did not and could not have relied on any representation that there was more than $654,400.00 maximum exposure per occurrence of underlying coverage." 436 F.Supp. at 877. This finding is amply supported by the evidence. American, of course, was not a party to the St. Paul policy. American's umbrella policy, specifying $654,400 of underlying cover-

---

5. Section 504 is quoted at page 9, *supra*. *See also* § 504, comment (b).

age, was bound 13 days before the start of negotiations that led to MelJoy's purchase of the St. Paul excess insurance. Indeed, MelJoy purchased the St. Paul excess policy to fill the gap between the existing primary per vessel coverage and the umbrella per occurrence coverage.

Not until after the explosion did American learn that St. Paul's policy nominally provided underlying coverage totaling far more than $654,400. Within a matter of days after American made this discovery, St. Paul told American that St. Paul's maximum exposure was actually $554,400. During that short interval, American did not act to its detriment in reliance on the St. Paul policy.

The extent of American's exposure has a substantial effect on its contingent profit commissions with respect to reinsurance. When American informed its reinsurers of their contingent liability, it computed the reserve for losses on the assumption that St. Paul provided per vessel coverage. However, American had known for almost four months that St. Paul insisted that its policy provided per occurrence coverage with a maximum exposure of $554,400. Therefore, adverse effects on American's readjustment of commissions result only from American's reliance on its own optimistic assessment of the outcome of this dispute over coverage. Finally, there is no suggestion that MelJoy and St. Paul acted fraudulently or even unfairly to harm American.

The judgment of the district court is reversed, and the case is remanded for reformation of the St. Paul policy and judgment for St. Paul in accordance with this opinion.